2005 ME 43

**Laurence E. BARRETT et al.**

v.

**McDONALD INVESTMENTS, INC., et al.**

Supreme Judicial Court of Maine.

Argued: Sept. 21, 2004.

Decided: March 29, 2005.

Paul F. Macri, Esq. (orally), Tyler N. Kolle, Esq., Berman & Simmons, P.A., Lewiston, for plaintiffs.

John J. Aromando, Esq., Clifford H. Ruprecht, Esq. (orally), Pierce Atwood, Portland, for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

Concurrence: ALEXANDER, J.

SAUFLEY, C.J.

[¶ 1] McDonald Investments, Inc., and Kevin R. Sullivan, an advisor employed by McDonald, appeal from a decision of the Superior Court (Kennebec County, *Marden, J.*) denying their motion to stay and compel arbitration of tort claims brought by Laurence E. Barrett and Edna M. Barrett. McDonald and Sullivan contend that the language of their arbitration agreement with Laurence Barrett unambiguously mandates the arbitration of the Barretts' claims of negligence, negligent misrepresentation, fraud, and punitive damages based on alleged misrepresenta-

tions about a retirement annuity purchased by the Barretts on Sullivan's recommendation. Because we conclude that the arbitration agreement is ambiguous and must be construed against the drafter, McDonald, we affirm the denial of McDonald and Sullivan's motion to stay and compel arbitration.

## I. BACKGROUND

[¶ 2] Laurence Barrett and his wife, Edna, allege the following facts. In 1999, Laurence was in his thirty-second year of employment and approached Key Bank for retirement advice. Key Bank referred Laurence to McDonald Investments, Inc., for investment advice. Kevin Sullivan, an investment advisor at McDonald, suggested to Laurence that he retire earlier than he had planned or increase his spending during retirement. Laurence decided to retire at his then current age of fifty-five.

[¶ 3] In February 2000, before McDonald accepted the Barretts' money for investment, Laurence Barrett and Sullivan executed an IRA Director Plan Agreement (the Agreement). Edna Barrett was listed as the sole beneficiary. The Agreement provided that Laurence would deposit funds with McDonald, which McDonald would invest in options selected by Laurence upon Laurence's instructions and direction. The Agreement disclaimed any fiduciary relationship and did not in any way describe McDonald or Sullivan as having any advisory roles. The Agreement provided for the arbitration of certain disputes:

The Custodian [McDonald] and the Depositor [Laurence Barrett] agree that by the Custodian opening and carrying an account for the Depositor, all controversies which may arise between us concerning any transaction or the construction, performance or breach of this or any other agreement between us per-

taining to securities and any other property, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration.

The Agreement required that arbitration be conducted "before the New York Stock Exchange, Inc., the National Association of Securities Dealers, Inc., The Municipal Securities Rulemaking Board, or other self-regulatory organization of which [McDonald] is a member" pursuant to the Federal Arbitration Act, 9 U.S.C.A. §§ 1–16 (West 1999 & Supp.2004) applying Ohio law.

[¶ 4] Sullivan then advised the Barretts to invest $505,379.87, the amount of their life savings from Laurence's 401k, in a Manulife individual retirement annuity contract with a Guaranteed Retirement Income Plan (GRIP) rider. Sullivan advised that the annuity with the GRIP rider would guarantee a minimum return of six percent on the initial investment regardless of the state of the stock market, minus the money the Barretts withdrew. Sullivan knew that there was a seven-year waiting period from the date of contract until annuitization, during which time the Barretts would have to withdraw funds annually to pay taxes and living expenses. Sullivan never advised the Barretts that there was a penalty for withdrawals or that the principal would be subject to market fluctuations. The Barretts followed Sullivan's advice and invested in the Manulife annuity.

[¶ 5] When the Barretts received the contract for the Manulife annuity in March 2000, it did not contain the GRIP rider. Nearly a year later, the Barretts also noticed that they did not receive any GRIP rider paperwork on the anniversary of their contract. They contacted Sullivan, who at that time discovered that Manulife had not issued the GRIP rider. Sullivan contacted Manulife, which agreed to allow the Barretts to elect the GRIP retroactive to the original contract date. The Barretts did not, however, receive a new contract and GRIP rider at that time.

[¶ 6] By November 2001, the account's value had diminished to $272,511.65 as a result of a drop in the market. When the Barretts contacted Sullivan to make sure the GRIP was operating as he had explained to them, Sullivan in turn contacted Manulife and learned that the GRIP did not function as Sullivan had represented to the Barretts. Sullivan and his supervisor met with the Barretts and a Manulife representative in December 2001. The Manulife representative explained that the GRIP rider did not guarantee six percent annual growth in the principal; rather, the principal was subject to variations in the stock market.

[¶ 7] In June 2003, the Barretts commenced the present action against McDonald, Sullivan, and Manulife.[1] The Barretts alleged claims of negligence, negligent misrepresentation, and fraud against McDonald and Sullivan. The Barretts also claimed they were entitled to punitive damages.

[¶ 8] In response, McDonald and Sullivan moved to stay and compel arbitration on the ground that the arbitration clause in their financial services contract with Laurence Barrett requires the submission of the present disputes to an arbitrator. See 14 M.R.S.A. § 5928 (2003). They attached the affidavit of McDonald's branch manager, who referred to and attached a copy of the Agreement containing the arbitration clause.

---

1. Because Manulife is not a party to this appeal, this opinion does not address the claims against it.

[¶ 9] The Barretts objected to the motion to stay and compel arbitration. They argued that the dispute concerned the advice to purchase the Manulife policy, not conduct related to the Agreement by which the Barretts deposited their life savings into a custodial account with McDonald.

[¶ 10] After a hearing, the court denied the motion to stay and compel arbitration as to the tort claims against McDonald and Sullivan, reasoning that the language of the agreement does not communicate an express waiver of the Barretts' right to bring tort claims. McDonald and Sullivan have timely appealed.

## II. DISCUSSION

[¶ 11] McDonald and Sullivan contend that the arbitration clause unambiguously provides for the arbitration of all disputes concerning any transaction that pertains to securities or other property. According to them, "all controversies" must be read to include tort disputes. They contend that even if the Agreement is ambiguous, the arbitration clause should be applied because it is susceptible to an interpretation that covers tort disputes.

[¶ 12] The Barretts contend that their tort claims have no nexus with the custodial Agreement and are not subject to the arbitration clause. The Barretts argue that the Agreement governs the administration of a custodial account, not misrepresentations about the nature and operation of the Manulife annuity and GRIP rider.

### A. Appellate Jurisdiction and Standard of Review

[¶ 13] Though the court's order denying a motion to compel arbitration is interlocutory, we have jurisdiction to review it. 14 M.R.S.A. § 5945(1) (2003); *Patrick v. Moran*, 2001 ME 6, ¶ 4, 764 A.2d 256, 257.

[¶ 14] The initial determination of "whether the parties intended to submit this dispute to arbitration" must be resolved in court, not by an arbitrator. *V.I.P., Inc. v. First Tree Dev. Ltd. Liab. Co.*, 2001 ME 73, ¶ 3, 770 A.2d 95, 96. The parties must have agreed to arbitrate in writing. *Patrick*, 2001 ME 6, ¶ 5, 764 A.2d at 257. We review the motion court's determination of substantive arbitrability for errors of law, *V.I.P.*, 2001 ME 73, ¶ 3, 770 A.2d at 96, and for facts not supported by substantial evidence in the record, *Saga Communications of New Eng., Inc. v. Voornas*, 2000 ME 156, ¶ 7, 756 A.2d 954, 958.

### B. Interpretation of the Arbitration Clause

[¶ 15] The issue before us presents a clear conflict between two established principles of contract interpretation. On one hand, Maine has a broad presumption in favor of arbitration. *Roosa v. Tillotson*, 1997 ME 121, ¶ 3, 695 A.2d 1196, 1197. On the other, we have long recognized that ambiguities in a contract are to be interpreted against the drafter. *See, e.g., Bar Harbor & Union River Power Co. v. Found. Co.*, 129 Me. 81, 85, 149 A. 801, 803 (1930). The tension between these doctrines is heightened when, as in this case, the parties to the contract are in unequal bargaining positions.

[¶ 16] The presumption in favor of substantive arbitrability advances the Maine Legislature's "strong policy favoring arbitration." *Westbrook Sch. Comm. v. Westbrook Teachers Ass'n*, 404 A.2d 204, 207–08 (Me.1979). We first recognized this policy in *Lewiston Firefighters Ass'n v. City of Lewiston*, 354 A.2d 154 (Me.1976), a case that involved the arbitration of public employees' contract grievances. In that case, we found that the Legislature

had determined that arbitration was the " 'desirable method' " for settling such contract disputes.[2] *Id.* at 165–66. Although the genesis of the strong presumption in favor of arbitration springs from labor law, the presumption has been expanded to disputes about private agreements outside the employment context. *See, e.g., Roosa,* 1997 ME 121, ¶ 1, 695 A.2d at 1197. Thus, we have said that when two parties have included a provision requiring arbitration in their contract, a subsequent dispute should be deemed arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *V.I.P.,* 2001 ME 73, ¶ 4, 770 A.2d at 96 (quotation marks omitted).

■ [¶ 17] In interpreting the language of an arbitration agreement to determine substantive arbitrability, however, we apply general principles of contract interpretation. *Granger N., Inc. v. Cianchette,* 572 A.2d 136, 138 (Me.1990). A bedrock rule of contract interpretation is that ambiguities in a document are construed against its drafter. 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 32:12 at 471–72 (4th ed. 1999) ("Since the language is presumptively within the control of the party drafting the agreement, it is a generally accepted principle that any ambiguity in that language will be interpreted against the drafter."). This rule has long been applied in Maine, for the reasons summarized in *Monk v. Morton,* 139 Me. 291, 30 A.2d 17 (1943):

> The rule that an ambiguous contract will be construed more strongly against him who uses the words concerning which doubt arises, is more than an arbitrary rule. Its purpose is to give effect to the intention of the parties. To the maker of an instrument is available language with which to adequately set forth the terms thereof. It is presumed that he will not leave undeclared that which he would claim as his right under the agreement; and the absence of a requirement against the obligee is evidence that such requirement was not within the understanding of the parties. He who speaks should speak plainly, or the other party may explain to his own advantage.

*Id.* at 295–96, 30 A.2d at 19 (quotation marks omitted).

■ [¶ 18] The rationale for interpreting ambiguities against the drafter is particularly compelling in contracts where one party had little or no bargaining power.[3] "[W]here a standard-form, printed contract is submitted to the other on a 'take it or leave it' basis, upon equitable principles the provisions of the contract are generally construed to meet the reasonable expectations of the party in the inferior bargaining position. . . ." *Dairy Farm Leasing Co. v. Hartley,* 395 A.2d 1135, 1139–40 n. 3

---

**2.** Arbitration offers its participants an expeditious method of resolving disputes, and often allocates decision-making to parties who are more informed and experienced with the issues at hand. *See Lewiston Firefighters Ass'n v. City of Lewiston,* 354 A.2d 154, 164–66 (Me.1976).

**3.** These types of contracts are often referred to as "contracts of adhesion," meaning "a contract entered without any meaningful negotiation by a party with inferior bargaining power." 11 SAMUEL WILLISTON & RICHARD LORD, A TREATISE ON THE LAW OF CONTRACTS § 32:12 at 476–79 (4th ed.1999). *See also Schroeder v. Rynel, Ltd., Inc.,* 1998 ME 259, ¶ 15, 720 A.2d 1164, 1167 (stating that "[a] contract of adhesion requires some element of 'overreaching' by a party who exploits a 'vastly unequal bargaining position' ") (quoting *Dairy Farm Leasing Co. v. Hartley,* 395 A.2d 1135, 1139 n. 3 (Me.1978)).

(Me.1978). In such cases, the party drafting the "take it or leave it" contract enjoys all of the advantages, not only in choosing its words, but also in rejecting any changes to the language. *See generally* Richard M. Alderman, *Pre–Dispute Mandatory Arbitration in Consumer Contracts: A Call for Reform*, 38 HOUS. L. REV. 1237, 1246–49 (2001) (discussing the imbalance of bargaining power in consumer contracts containing mandatory arbitration provisions).

▆ [¶ 19] The Agreement in the present case provides for the arbitration of "all controversies which may arise between [McDonald and Laurence Barrett] concerning any transaction or the construction, performance or breach of this or any other agreement between [them] pertaining to securities and any other property." Notwithstanding the seemingly broad language of the arbitration clause, the Agreement within which this paragraph is contained characterizes McDonald as acting purely at the behest of Laurence Barrett and does not in any way address the giving of investment advice. Accordingly, in the context of this Agreement, where the parties expected McDonald to act in a purely custodial capacity, it is unclear whether the giving of investment advice constitutes a "transaction" within the meaning of the arbitration clause. It is also unclear from the Agreement whether the giving of investment advice constitutes "any other agreement" between the parties. These uncertainties create ambiguities in determining the reach of the agreement to arbitrate.

[¶ 20] Because the parties do not dispute that McDonald accepted the Barretts' money conditioned on the execution of the Agreement, we must determine whether to follow our long-held principle that an ambiguity in a contract be construed against the drafter or to apply the principle that doubts should be resolved in favor of arbitrability.

[¶ 21] In this context, where an individual with little leverage is entering into an agreement with a larger entity that offers its services on a "take it or leave it" basis, we conclude that the balance tips in favor of applying the equitable rule favoring the construction of the contract against the drafter. *See Dairy Farm Leasing Co.,* 395 A.2d at 1139–40 n. 3. McDonald inserted this arbitration clause into a contract that governed McDonald's *custodial* function in handling the Barretts' money, rather than its *advisory* function in giving investment advice. We will not take a broad and expansive view of the arbitration clause in these circumstances to encompass claims that are unrelated to the substance of the Agreement. Because the arbitration agreement can be read to apply only to actions and transactions related to McDonald's and Sullivan's conduct as custodian, we conclude that it does not apply to the alleged wrongdoing related to professional advice given regarding the Manulife account.[4]

[¶ 22] In this retreat from our previously broad presumption in favor of arbitration, we join other courts that have favored interpreting ambiguous arbitration clauses against the drafter. *See, e.g., Seifert v. U.S. Home Corp.,* 750 So.2d 633, 641 (Fla. 1999); *Victoria v. Superior Court,* 40

---

4. Our holding in the present case is unaffected by our recent opinion in *Stenzel v. Dell, Inc.,* 2005 ME 37, 870 A.2d 133. There, we applied the law of Texas in determining that an arbitration clause contained in a purchase and sale agreement was not unconscionable.

*Id.* ¶ 32, 870 A.2d at 144–45. In the present case, we determine whether to construe an ambiguity in an arbitration clause in favor of arbitration or against the drafter pursuant to Maine law.

Cal.3d 734, 222 Cal.Rptr. 1, 710 P.2d 833, 838–39 (1985).[5] This holding does not affect the presumption favoring arbitrability when such provisions are actually negotiated, or when parties of equal bargaining power are involved. We merely hold that when a party drafts an agreement requiring arbitration, and offers it to individuals on a take-it-or-leave-it basis, the drafter bears the risk if its chosen language is found to be ambiguous.

[¶ 23] Accordingly, although we reach our conclusion on different grounds than did the motion court, we affirm the court's denial of the motion to stay and compel arbitration of counts IV, V, VIII, and X.[6]

The entry is:

Judgment affirmed.

ALEXANDER, J., concurring.

[¶ 24] I join the Court's opinion. The Barretts' life savings and Laurence's signature on the agreement were procured by what are asserted to be knowingly fraudulent representations by McDonald and Sullivan regarding the nature and quality of the Manulife investment.

[¶ 25] As an alternative basis to affirm, I would hold that when a contract is asserted to have been procured as a result of a fraud perpetrated by a contracting party with a significantly superior bargaining position, a compulsory arbitration clause may be avoided, allowing the fraud claim to be heard by the court. It would be a perverse result to allow McDonald and Sullivan to procure Laurence Barrett's signature and the Barretts' life savings by fraud, drain half the value from their retirement funds, and then enforce the fraudulently procured contract to cut off the Barretts' access to the courts and force them to arbitrate their claim before a securities industry organization.

[¶ 26] Nearly forty years ago, and despite an articulate dissent by Justice Black, the United States Supreme Court held that the Federal Arbitration Act, 9 U.S.C.A. §§ 1–16 (West 1999 & Supp. 2004), required that when a contract contains a mandatory arbitration clause, a claim of fraud in the inducement of the contract must be resolved by an arbitrator, not the courts. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). A 1984 opinion, *Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), held that the Federal Arbitration Act was applicable to the states and limited the capacity of the state legislatures and courts to invalidate arbitration clauses in contracts and allow claims to be brought directly to court. *Id.* at 10–16, 104 S.Ct. 852. A 1987 opinion, *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), held that fraud claims by investors asserted under federal or

---

**5.** Faced with ambiguities in institutionally drafted arbitration agreements, courts of other jurisdictions differ on whether to construe contracts in favor of arbitration or against the drafter. *Compare Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir.1993), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993) (adopting policy in favor of arbitration to resolve ambiguity in arbitration agreement); *Allen v. Pacheco*, 71 P.3d 375, 380–81 (Colo.2003), *cert. denied*, 540 U.S. 1212, 124 S.Ct. 1406, 158 L.Ed.2d 140 (2004) (same); *Freeman v. Minolta Bus. Sys.,*

*Inc.*, 699 So.2d 1182, 1187 (La.Ct.App.1997) (same); *with Victoria v. Superior Court*, 40 Cal.3d 734, 222 Cal.Rptr. 1, 710 P.2d 833, 838–39 (1985) (construing the arbitration clause against the drafter); *Seifert v. U.S. Home Corp.*, 750 So.2d 633, 641 (Fla.1999) (same).

**6.** Although it is not clear that the court addressed each count, we conclude that none of the claims against McDonald and Sullivan are required to be arbitrated.

state statutes designed to protect investors must be resolved by arbitrators in accordance with mandatory arbitration clauses, preempting statutory protections and judicial remedies enacted by Congress. *Id.* at 228–38, 107 S.Ct. 2332.

[¶ 27] The passage of time and events, particularly the increased use of contracts of adhesion containing mandatory arbitration clauses to avoid judicial enforcement of federal and state anti-discrimination and consumer protection laws, is leading many appellate courts to distinguish and weaken the significance of these precedents from an earlier time in the development of arbitration law. *See, e.g., Ticknor v. Choice Hotels Int'l, Inc.,* 265 F.3d 931, 941–42 (9th Cir.2001), *cert. denied,* 534 U.S. 1133, 122 S.Ct. 1075, 151 L.Ed.2d 977 (2002) (overruling prior decisions that adhesion contract principles could not be invoked to avoid arbitrability of disputes); *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.,* 263 F.3d 26, 31–32 (2d Cir.2001) (interpreting *Prima Paint* to allow a trial of the arbitrability issue when a party alleges and provides some evidence that a contract is void, rather than voidable, or that the arbitration clause itself is voidable pursuant to New York law that fraud in the inducement makes a contract voidable); *Willems v. U.S. Bancorp Piper Jaffray, Inc.,* 2005 MT 37, ¶¶ 1, 27–28, 326 Mont. 103, 107 P.3d 465, 470 (holding, in a consolidated action for mismanagement of investments, that an arbitration clause was not enforceable when investment advisors had a fiduciary duty to explain the consequences of the arbitration clause and did not do so).

[¶ 28] One factor promoting increased caution in enforcing mandatory arbitration clauses is the capacity of many arbitrators to ignore laws adopted to protect consumers and employees. The arbitrators of the securities industry groups to whom investor claims are referred are advised by their self-regulating organizations that they need not follow the law in their arbitration decisions. *See* Kenneth R. Davis, *The Arbitration Claws: Unconscionability in the Securities Industry,* 78 B.U. L. REV. 255, 302–03, 319 (1998). Although the advice that the securities industry may give its arbitrators authorizing them to ignore the law in their decision-making may seem notable, it reflects statutory and court-approved standards for judicial review of arbitration decision-making. An arbitrator "is under no duty to resolve a dispute in compliance with the parties' legal rights." Paul D. Carrington & Paul Y. Castle, *The Revocability of Contract Provisions Controlling Resolution of Future Disputes Between the Parties,* 67 LAW & CONTEMP. PROBS. 207, 217 (2004). The Maine Uniform Arbitration Act states that "the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award." 14 M.R.S.A. § 5938(1) (2003). Interpreting this law, we have held that courts may not vacate an arbitration award merely because the arbitrator erred in interpreting the applicable law. *Union River Valley Teachers Ass'n v. Lamoine Sch. Comm.,* 2000 ME 57, ¶¶ 5, 11, 748 A.2d 990, 991, 993; *Cape Elizabeth Sch. Bd. v. Cape Elizabeth Teachers Ass'n,* 459 A.2d 166, 174 (Me.1983); *see also Bennett v. Prawer,* 2001 ME 172, ¶¶ 8–9, 786 A.2d 605, 608–09; *Dep't of Transp. v. Maine State Employees Ass'n, SEIU Local 1989,* 606 A.2d 775, 777 (Me.1992).

[¶ 29] This view of arbitration as a process above the substantive law and not bound by it developed in the middle of the last century, when most arbitration agreements, as in *Prima Paint,* arose from collective bargaining agreements, construction contracts, or other transactions between parties, usually businesses,

of relatively equal bargaining power.[7] The last quarter of the century saw enactment of many federal and state anti-discrimination and consumer protection laws. At the same time, businesses greatly expanded imposition of unnegotiated, mandatory arbitration clauses in consumer transactions and employment agreements between parties of significantly unequal bargaining power. Carrington and Castle characterize this latter development as an "epidemic of arbitration clauses in contracts of adhesion." Carrington & Castle, *The Revocability of Contract Provisions*, 67 LAW & CONTEMP. PROBS. at 217.

[¶ 30] The combination of exemption of arbitration awards from review for errors of law, imposition and enforcement of mandatory arbitration clauses, and limitation of arbitrations to internal securities industry forums[8] invites the wholesale flouting of federal and state laws designed to protect investors and provide them with judicially enforceable remedies against fraud and abuse. There has been increased recognition in the past five years of the need for greater vigilance to protect investors from fraud, theft, and financial manipulation in the securities industry. That increased vigilance calls into question whether courts can continue to enforce mandatory arbitration clauses in fraudulently obtained contracts that force injured investors to arbitrate before industry groups and bar injured investors from accessing judicial remedies authorized by law to protect them. *See Blythe v. Deutsche Bank AG*, No. 04 Civ.

5867(SAS), 2005 WL 53281, at \*\*5–6, 2005 U.S. Dist. LEXIS 292, at \*\*18–24 (S.D.N.Y. Jan. 7, 2005) (stating, as dictum, that a fraudulently obtained contract with a mandatory arbitration clause might be enforced against an innocent party, but holding that the court would refuse to enforce a mandatory arbitration clause in a tax shelter investment scheme where there were elements of mutual fraud in dealings by the parties). *See generally* David S. Schwartz, *Correcting Federalism Mistakes in Statutory Interpretation: The Supreme Court and the Federal Arbitration Act*, 67 LAW & CONTEMP. PROBS. 5, 44 (2004) (suggesting that at least five members of the present court have taken positions inconsistent with maintaining the preemptive effect of the *Southland* opinion). *See also Willems*, 2005 MT 37, ¶¶ 27–28, 107 P.3d at 470; *Rivera v. Clark Melvin Secs. Corp.*, 59 F.Supp.2d 297, 304 (D.P.R.1999); *Woodyard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 640 F.Supp. 760, 766–67 (S.D.Tex.1986); Davis, *The Arbitration Claws*, 78 B.U. L. REV. at 317–27.

[¶ 31] Pursuant to the Federal Arbitration Act, arbitration agreements are valid and enforceable except "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2 (West 1999). The validity of arbitration agreements is judged by applying "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

---

7. An unscientific review of annotations to the Federal Arbitration Act, 9 U.S.C.A. §§ 1–16 (West 1999 & Supp.2004) and the Maine Uniform Arbitration Act, 14 M.R.S.A. §§ 5927–5949 (2003), suggests that the vast majority of arbitration cases that reached appellate courts before 1975 or 1980 involved one of these three categories of business relationships.

8. *See Hooters of America, Inc. v. Phillips*, 173 F.3d 933, 938–40 (4th Cir.1999) (declining to enforce arbitration clause in employment contract because arbitration forum and processes controlled by employer were one-sided and unfair).

Generally applicable state law contract defenses, "such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *Ticknor,* 265 F.3d at 941–42.

[¶ 32] Pursuant to Maine law, fraud in the inducement of a contract may void or vitiate the contract. *Delahanty v. Chicoine Motor Sales, Inc.,* 151 Me. 429, 433–34, 120 A.2d 714, 716–17 (1956); *Dubie v. Branz,* 146 Me. 455, 460, 73 A.2d 217, 220 (1950). Separately, when a court finds a contract or any clause in a contract "to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." 11 M.R.S.A. § 2–302(1) (1995). A contract of adhesion is a standardized contract that is imposed and drafted by a party with a superior bargaining position, and that gives the other party only the choice to accept or reject the contract. *Dairy Farm Leasing Co. v. Hartley,* 395 A.2d 1135, 1139–40 n. 3 (Me.1978); *Irwin v. UBS Painewebber, Inc.,* 324 F.Supp.2d 1103, 1108 (C.D.Cal.2004); *Armendariz v. Found. Health Psychcare Servs., Inc.,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 689 (2000); *Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 355 (Tex.1987). A contract of adhesion is not *per se* unconscionable, but the defense of unconscionability may be asserted to a contract of adhesion "exacted by the overreaching of a party." *Dairy Farm Leasing Co.,* 395 A.2d at 1139–40 n. 3.

[¶ 33] In deciding claims of unconscionability, courts consider a variety of factors that may be indicative of procedural or substantive unconscionability. *Jenkins v.*

*First American Cash Advance of Ga. LLC,* No. 03–16329, 2005 WL 388269, at **5–6, 2005 U.S.App. LEXIS 2922, at **15–16 (11th Cir. Feb. 18, 2005); *Al–Safin v. Circuit City Stores, Inc.,* 394 F.3d 1254, 1258–59 (9th Cir.2005); *Ferguson v. Countrywide Credit Indus., Inc.,* 298 F.3d 778, 783 (9th Cir.2002). In *Kloss v. Edward D. Jones & Co.,* 2002 MT 129, ¶ 30, 310 Mont. 123, 54 P.3d 1, 8–9, *cert. denied,* 538 U.S. 956, 123 S.Ct. 1633, 155 L.Ed.2d 506 (2003), the Montana Supreme Court suggested eight factual issues that should be addressed in determining whether a mandatory arbitration clause in a contract of adhesion may be unconscionable:

1. Are potential arbitrators disproportionately employed in one or the other party's field of business?

2. Do arbitrators tend to favor "repeat players" as opposed to workers or consumers who are unlikely to be involved in arbitration again? In other words, is there a tendency by arbitrators to avoid decisions which will result in the loss of future contracts for their services?

3. What are the filing fees for arbitration compared to the filing fees in Montana's district courts?

4. What are arbitrators' fees? Do they make small claims prohibitive? Do they discriminate against consumers or workers of modest means?

5. Are arbitration proceedings shrouded in secrecy so as to conceal illegal, oppressive or wrongful business practices?

6. To what extent are arbitrators bound by the law?

7. To what extent are arbitrators bound by the facts?

8. What opportunity do claimants have to discover the facts necessary to prove a claim such as a company's business practices?

*Id.; see also Faber v. Menard, Inc.*, 367 F.3d 1048, 1053 (8th Cir.2004) (suggesting five criteria to consider as cited in *Home Fed. Sav. & Loan Ass'n v. Campney*, 357 N.W.2d 613, 618 (Iowa 1984)).

[¶ 34] Here, the Barretts were not advised of and did not specifically agree to the arbitration terms of the fraudulently procured contract. The contract was presented on a take-it-or-leave-it basis; McDonald Investments was favored by greatly disparate bargaining power; the arbitrators are not bound by the law; and the arbitration process is managed by internal securities industry organizations.

[¶ 35] The contract between the Barretts and McDonald Investments is a contract of adhesion, and it appears to be procedurally unconscionable, considering the factors discussed above. *See Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892–95 (9th Cir.2002), *cert. denied*, 535 U.S. 1112, 122 S.Ct. 2329, 153 L.Ed.2d 160 (2002); *Irwin*, 324 F.Supp.2d at 1108.

[¶ 36] Substantive unconscionability or unfairness " 'focuses on the terms of the agreement and whether those terms are so one-sided as to shock the conscience.' " *Ferguson*, 298 F.3d at 784 (quoting *Kinney v. United Healthcare Servs., Inc.*, 70 Cal.App.4th 1322, 1330, 83 Cal.Rptr.2d 348 (Cal.Ct.App.1999)); *see also Al–Safin*, 394 F.3d at 1261. An agreement to procure someone's life savings, obtained by knowingly fraudulent representations, is the essence of substantive unconscionability or unfairness that provides a valid defense against enforcement of the agreement, separate from the fraud defense. I would hold that the Barretts may bring their fraud claim and their defenses of fraud in the inducement and unconscionability directly to court, whether the arbitration clause is ambiguous or not.