STATE OF MAINE                                          SUPERIOR COURT
PENOBSCOT, ss                                           CIVIL ACTION
                                                        DOCKET NO. RE-08-14
                                                        WRA- PEN - 12/9/2010

JEFFREY B. GRASS, d/b/a
J.B. GRASS EXCAVATING

    Plaintiff,

    v.                                              **ORDER ON DEFENDANT**
                                                        **PM CONSTRUCTION'S**
RICHMOND BANGOR                                         **MOTION IN LIMINE**
DEVELOPMENT, LLC,
PM CONSTRUCTION CO., INC.,
EASTERN BANK and
KATAHDIN TRUST COMPANY

    Defendants.


Before the Court is Defendant PM Construction Co., Inc. ("PM")'s *motion in limine* requesting that Article 9 ("Article 9") of the contract ("Contract") between PM and Plaintiff Jeffrey B. Grass, d/b/a J.B. Grass Excavating ("Grass") be found unambiguous, therefore excluding any parol evidence relating to Article 9. Additionally, PM asks that the Court "rule that Article 9 did not require PM Construction and Grass to agree upon and execute change orders as a condition precedent to Grass being obligated to perform changes to the scope of work as originally set forth in the Contract." (Def.'s M. Limine 1.). In response, Grass has filed in opposition to PM's motion, requesting that the Court rule that the Contract was unambiguous but required written change orders between Grass and PM before any additional work was to be performed. In the alternative, Grass requests that the Court find that the relevant Contract provisions are ambiguous. Finally, Grass asks that if PM's interpretation of the Contract is adopted, Article 9 be found unconscionable, invalid and unenforceable. (Pl.'s Opp. M. Limine 1.).

1

## I. FACTUAL BACKGROUND

Grass and PM agree about little in the factual record. Points of disagreement between the parties regarding the facts will be noted. In or about September 2007, PM and Grass entered into the Contract with PM serving as the contractor and Grass a subcontractor on a project building a Walgreen's Pharmacy in Bangor. The Contract, which both parties acknowledge as accurate, is attached as Exhibit 1 to Defendant's Motion in Limine. The parties also both acknowledge that Exhibit 2 to Defendant's Motion in Limine, entitled "AIA Document A101™ - 1997" ("Owner's Contract") is the controlling agreement between PM and the site's owner The Richmond Company, Inc. ("Richmond").

At some point during the project, a dispute arose between Grass and PM regarding the scope of the excavation work Grass was obligated to perform under the Contract. Grass contends that after beginning work on the project, it was discovered that serious differences existed between the elevations identified in the site plans and documents provided by PM and the actual elevations at the site. (Pl.'s Opp. M. Limine 3.). Further, Grass alleges that PM instructed Grass to alter the proscribed method for excavating trenches after Grass had began performing the work, creating a significant increase in work. (Pl.'s Opp. M. Limine 4.). Finally, Grass claims that the initial plans and specifications indicated that the soils excavated on site would be used for fill and backfill, but after commencing work PM directed him to remove the excavated soil and obtain backfill from off site, which caused Grass added work and expenses. *Id.*

2

PM, while not addressing specific incidents, generally denies that Grass was instructed to complete any work outside the scope of their agreement, but accepts the contention solely for the purposes of this motion. (Def.'s M. Limine 2.).

At the time the dispute arose, Grass refused to continue work on the project until Grass and PM agreed on written change orders delineating the scope of the new work as well as Grass's compensation for performing. (Pl.'s Opp. M. Limine 4-5.). Grass claims that PM's project manager issued assurances that change orders would be executed, but that instead of providing change orders, PM hired another excavation company to perform the additional work and the remaining work under the Contract. (Pl.'s Opp. M. Limine 5.). PM disagrees that change orders were necessary, and alleges that Grass left the project. (Def.'s M. Limine 1-2.).

At issue is the interpretation of Article 9 of the Contract, reprinted here in full:

> Contractor may unilaterally make changes in the work covered by this Subcontract. Upon receipt of Contractor's written authorization to proceed with changed work, Subcontractor shall perform the changed work without delay. Extra compensation for such changed work will only be allowed when the amount has been agreed to prior to the execution of the changed work or when Contractor has been paid extra compensation by the Owner for said changed work. No compensation for changes or any other claims whatsoever shall be allowed unless Contractor is entitled to payment for Owner and the claim is submitted to Contractor in a timely fashion allowing Contractor to process the claim under the terms of the Contract Documents. The failure to so submit claims in a timely manner shall be deemed a waiver of the claim by the Subcontractor. All changes must be authorized by Contractor's form before payment will be made. (Def. Exh. 1, 2).

## II. APPLICABLE LAW

"The issue of whether contract language is ambiguous is a question of law for the court." *Portland Valve, Inc. v. Rockwood Systems Corp.*, 460 A.2d 1383, 1387 (Me. 1983). *See also Beal v. Allstate Insurance Company*, 2010 ME 20, ¶ 26, 989 A.2d 733, 741. If the contract language is unambiguous, its interpretation is also a question of law for the Court. *Portland Valve*, 460 A.2d at 1387. "A contract provision is considered ambiguous if it is reasonably possible to give that provision at least two different meanings." *Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶ 9, 748 A.2d 457, 461. "The parol evidence rule operates to exclude from judicial consideration extrinsic evidence offered to alter, augment or contradict the unambiguous language of an integrated written agreement." *Handy Boat Serv. v. Proffessional Servs.*, 1998 ME 134, ¶ 11, 711 A.2d 1306, 1308-09.

## III. DISCUSSION

### a. Ambiguity and the Parol Evidence Rule

PM argues that Article 9 is an unambiguous statement that PM could unilaterally make changes to Grass's scheduled work, which Grass was obligated to perform upon receipt of written authorization. Regarding payment, PM points out that there are two possible methods for payment in Article 9: upon an agreement for extra compensation in advance of the work being done, or if the Owner compensated PM for the extra work. PM classifies the payment provisions as a condition precedent to Grass obtaining extra payment and not a pre-condition to the obligation to perform extra work.

Grass counters by arguing that Article 9 is ambiguous because "[i]t makes no sense that within the same paragraph, one can first force someone to do work without receiving compensation and then state that no extra compensation will be allowed for the

4

work if it is not agreed to *prior to execution of the work.*" (Pl.'s Opp. M. Limine 10.) (emphasis added). The plain language of Article 9 speaks against this argument.

Article 9 states that "[e]xtra compensation for such changed work will only be allowed when the amount has been agreed to prior to the execution of the changed work or when Contractor has been paid extra compensation by the Owner for said changed work." (Def. Exh. 1, 2). This statement, while serving the interests of PM, is not ambiguous. It simply means that if there is not an agreement for payment prior to PM providing Grass with a work authorization, PM will pay Grass upon receiving compensation for the extra work from Richmond. There is no provision in Article 9 saying that a claim for compensation for extra work must be provided *prior to* the work being completed, as Grass argues. The Contract provision simply requires the claim to be made "in a timely fashion" (alternatively, it is also referred to as "in a timely manner"). (Def. Exh. 1, 2). Thus, a plain reading of Article 9 shows a single method for PM to direct Grass to complete extra work and two non-conflicting, unambiguous pathways for Grass to be compensated for performing.

Grass alternatively argues that Article 9 is ambiguous based upon conflicts with other portions of the Contract. (Pl.'s Opp. M. Limine 11.). Grass first points to paragraph 2 of page 1 of the Contract, which states "Contractor agrees that it will pay to Subcontractor in accordance with the provisions of Section 7, and subject to and [sic] increases and decreases resulting from changes that may be agreed upon." (Def. Exh. 1, 1). Grass argues that this section states that there will be no increases or decreases in compensation unless they are agreed upon.

5

This reading does not conflict with Article 9 to create any ambiguity. Not only would an agreement upon changed compensation prior to completing the work be an agreement upon changes, but so would an agreement based upon the alternative form of payment specified in Article 9: a submitted claim to PM, which is in turn compensated by Richmond, resulting in PM agreeing to compensate Grass.[1]

Article 9 must therefore be determined to be unambiguous, and because Article 9 is unambiguous, the parol evidence rule works to exclude extrinsic evidence offered regarding the language of the Contract.

## b. Interpretation of Unambiguous Language

Having determined the language of Article 9 to be unambiguous, the Court then turns to interpreting Article 9. Grass argues that Article 4 of the Contract incorporates the Owner's Contract's use of the phrase "NO CHANGES WITHOUT WRITTEN CHANGE ORDER/ADDITIONAL WORK AUTHORIZATION IN ADVANCE OF THE WORK" to require written change orders before proceeding. (Pl.'s Opp. M. Limine 6, quoting Owner's Contract §4.2, 7.6.). However, Article 4 of the Contract states:

> Also incorporated herein by reference are the General Conditions of the Contract between the General Contractor and the Owner of said Project, and Subcontractor hereby agrees to be bound to Contractor by said General Conditions in the same manner and to the same extent as the General Contractor is bound to the owner, except as the same may be modified herein. (Def. Exh. 1, 2).

---

[1] Grass also points to the merger clause of the Contract (Article 21), and the clause of the Contract incorporating the Owner's Contract as far as it is unmodified by the Contract (Article 4) as supporting his argument that the agreement is ambiguous. Neither clause affects the reading of Article 9 or the procedures it establishes.

6

A full reading of Article 4 thus shows that despite what may be contained in the Owner's Contract regarding authorization for changed work, Article 9 of the Contract modifies that provision.

The plain language of Article 9 states that in order to begin extra work, PM may unilaterally provide Grass with written authorization to perform, which Grass shall undertake without delay. There is no requirement for a mutually agreed upon change order contained in the Contract, as Grass contends.

**c. Unconscionability**

Grass finally argues that, failing a finding of ambiguity or that a plain reading of unambiguous language requires a written change order, Article 9 is unconscionable and therefore unenforceable. Grass makes three arguments for procedural unconscionability: (1) the take-it-or-leave-it nature of the offer; (2) the use of a broad range of contract documents including fine print and convoluted language; and (3) PM's enhanced bargaining power. Grass also claims substantive unconscionability because the terms of Article 9 are "so one-sided as to shock the conscience." (Pl.'s Opp. M. Limine, 15, citing *Barrett v. McDonald Investments, Inc.*, 2005 ME 43, ¶ 36, 870 A.2d 146, 156 (J. Alexander concurring)(citations and quotation marks omitted).).

No evidence has been provided regarding the negotiation of the Contract, so it is impossible to rule on the procedural unconscionability of the Contract. Regarding the substantive unconscionability claims, Article 9 does not state that Grass will not be paid if compensation is not decided upon prior to starting work. A process for submitting claims for extra work already performed is provided, in which PM would compensate Grass upon receipt of compensation from Richmond.

7

The entry is:

1. The Contract between Grass and PM was not ambiguous.
2. Parol Evidence will not be considered to construe the meaning of the Contract.
3. The Contract required only Grass's receipt of "written authorization" from PM to proceed with changed work.
4. Article 9 of the Contract was not unconscionable.

The Clerk may make this entry on the docket by reference.

Date: December _9_, 2010

William R. Anderson
Justice, Superior Court

JEFFREY B GRASS DBA J B GRASS EXCA  - PLAINTIFF
3000 BROADWAY
GLENBURN ME 04401
Attorney for: JEFFREY B GRASS DBA J B GRASS EXCA
DONALD F BROWN  - RETAINED 10/27/2009
DON BROWN LAW OFFICE
424 SOUTH MAIN ST
PO BOX 3370
BREWER ME 04412


Attorney for: JEFFREY B GRASS DBA J B GRASS EXCA
JOHN BUNKER  - WITHDRAWN 11/03/2009
PAINE LYNCH & HARRIS
PO BOX 1451
BANGOR ME 04402-1451



vs
EASTERN BANK - DEFENDANT
C/O TERENCE A. MCGINNIS ONE EASTERN PLACE EP5-10
LYNN MA 01901
Attorney for: EASTERN BANK
THEODORE SMALL  - RETAINED 05/30/2008
BERNSTEIN SHUR SAWYER & NELSON
100 MIDDLE ST
PO BOX 9729
PORTLAND ME 04104-5029


Attorney for: EASTERN BANK
MICHAEL BOSSE  - RETAINED 05/30/2008
BERNSTEIN SHUR SAWYER & NELSON
100 MIDDLE ST
PO BOX 9729
PORTLAND ME 04104-5029


KATAHDIN TRUST COMPANY - DEFENDANT
C/O MARY BONNIE LONDON P O BOX 36
HOULTON ME 04730
Attorney for: KATAHDIN TRUST COMPANY
THEODORE SMALL  - RETAINED 05/30/2008
BERNSTEIN SHUR SAWYER & NELSON
100 MIDDLE ST
PO BOX 9729
PORTLAND ME 04104-5029


Attorney for: KATAHDIN TRUST COMPANY
MICHAEL BOSSE  - RETAINED 05/30/2008
BERNSTEIN SHUR SAWYER & NELSON
100 MIDDLE ST
PO BOX 9729
PORTLAND ME 04104-5029


Attorney for: KATAHDIN TRUST COMPANY
DANIEL R NELSON  - RETAINED
SEVERSON HAND & NELSON PA
355 MARKET SQUARE

SUPERIOR COURT
PENOBSCOT, ss.
Docket No  BANSC-RE-2008-00014


**DOCKET RECORD**