STATE OF MAINE                                   SUPERIOR COURT
ANDROSCOGGIN, ss.                                CIVIL ACTION
                                                 DOCKET NO. CV-21-22


HENRIETTA CHAREST,

        Plaintiff

        v.                                       ORDER ON MOTION FOR
                                                 SUMMARY JUDGMENT
OCF-HEALTH CLUBS,

        Defendant

The matters before the court are plaintiff Henrietta Charest's motion for partial summary

judgment and Defendant OCF-Health Clubs' ("OCF") cross-motion for summary judgment. For

the following reason, Ms. Charest's motion will be granted and OCF's cross-motion will be

denied.

Background

The parties have, for the most part, agreed on the facts relevant to Ms. Charest's partial

summary judgment motion for the purposes of deciding these competing motions. (*See* Def.'s

Opp. 2.)

Ms. Charest joined Orange Circuit Fitness in 2018, when she was 87 years old, to get

more exercise as recommended by her doctors. (Pl.'s Supp.'g S.M.F. ¶¶ 1-3.) OCF is a health

club with multiple locations in the state of Maine. (*Id.* ¶ 6.) Ms. Charest went to the club OCF

operates in the Auburn Mall, located at 550 Center Street, Auburn, Maine. (*Id.* ¶ 8.) Customers

could access the OCF building through a heavy exterior door in the front of the building, which

was connected to the Auburn Mall. (*Id.* ¶ 9.)

Ms. Charest alleges that the exterior door to the OCF building in the Auburn Mall was

not functioning properly. Specifically, Ms. Charest alleges that the door would close with

excessive speed, which could cause it to strike users before they had fully crossed the threshold. (*Id.* ¶¶ 10-12.) Ms. Charest alleges that the problem was worse on windy days. (*Id.* ¶ 13.) Ms. Charest alleges that the problem would have required simple maintenance on the door to fix, and that OCF was on notice that the door was dangerous. (*Id.* ¶¶ 17-21.)

On October 18, 2018, Ms. Charest walked through OCF's door at around 5:17 AM. (*Id.* ¶ 25.) There was strong wind that day, which caused the door to slam shut. (*Id.* ¶¶ 22, 26.) Ms. Charest was hit by the door as it slammed closed, causing her to fall inside the doorway, sustaining injuries. (*Id.* ¶ 26.)

On March 25, 2021, Ms. Charest filed a tort claim against OCF on a premises liability theory. On April 28, 2021, OCF filed an answer in which it raised the affirmative defense that Ms. Charest's claim was barred by a release that Ms. Charest had signed as part of a Membership Agreement she was required to sign to use OCF's facilities.

The Membership Agreement contains the following release:

> I understand and expressly agree that use of this orange circuit fitness facility and/or use of any other orange circuit fitness facility, involves risk of injury to me and/or my guests whether caused by me or not. I understand that these risks can range from minor injuries to major injuries including death. In consideration of my participation in the activities and use of the facilities offered by orange circuit fitness, I understand and voluntarily accept these risks and agree that orange circuit fitness, its officers, directors, employees, members, agents, vendors, independent contractors, heirs, estates, representatives, shareholders, successors, subsidiaries and its assigns or affiliated companies will not be liable for any injury, including, without limitation, personal, bodily, or mental injury, economic loss or any damage to me, my property, my spouse, my domestic partner, my guests, my unborn child, my relatives, my heirs, or my estate, resulting from the negligence of orange circuit fitness or anyone on behalf of orange circuit fitness, whether related to exercise or not. Accordingly, I do hereby forever release and discharge orange circuit fitness from any and all claims, demands, injuries, damages, losses, actions or causes of action.

(*Id.* ¶ 33.) The Membership Agreement is a standardized contract presented to all OCF customers before they are allowed to use OCF facilities. (*Id.* ¶¶ 34-35.) OCF was responsible for drafting it. (*Id.* ¶ 35.)

The only questions presented by the motions currently under advisement are whether the above-quoted release is enforceable, and if so, whether it bars Ms. Charest's claims.

Standard

Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. City Mortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation omitted). "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." M.R. Civ. P. 56(h)(4). In order to controvert an opposing party's factual statement, a party must "support each denial or qualification by a record citation." M.R. Civ. P. 56(h)(2). "Assertion of material facts must be supported by record references to evidence that is of a quality that would be admissible at trial." *HSBC Mortg. Servs. v. Murphy*, 2011 ME 59, ¶ 9, 19 A.3d 815.

The interpretation of a contract, including whether its terms are ambiguous, is a question of law. *Scott v. Fall Line Condo. Ass'n*, 2019 ME 50, ¶ 6, 206 A.3d 307. Maine courts construe contracts "in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument. All parts and clauses must be considered together that it may be seen if and how one clause is explained, modified, limited or controlled by the others."

3

*Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 11, 814 A.2d 989. Ultimately, courts seek "to give effect to the plain meaning of the words used in the contract and avoid rendering any part meaningless." *Dow v. Billing*, 2020 ME 10, ¶ 14, 224 A.3d 244. Ordinarily, interpretation of an ambiguous contract is a question of fact resolved by extrinsic evidence. *Id.* However, in the context of a contract of adhesion, ambiguities must be construed against the drafter. *State Farm Mut. Auto Ins. Co. v. Koshy*, 2010 ME 44, ¶ 55, 995 A.2d 651; *Barrett v. McDonald Invs., Inc.*, 2005 ME 43, ¶ 18, 870 A.2d 146.

Discussion

Ms. Charest raises four arguments against the release's enforceability. First, Ms. Charest argues that the release is void as against public policy. Second, Ms. Charest argues that the release is an unconscionable contract of adhesion. Third, Ms. Charest argues that the release does not exclude her claims by its own terms. Fourth and finally, Ms. Charest argues that the terms of the release were not brought home to her.

Parties may draft agreements that release one or both of them from liability for their own simple negligence without violating public policy.[1] *Lloyd v. Sugarloaf Mt. Corp.*, 2003 ME 117, ¶ 10, 833 A.2d 1. However, releases from negligence liability have traditionally been viewed with some disfavor by the courts. *Doyle v. College*, 403 A.2d 1206, 1207 (Me. 1979). Therefore, a release must "expressly spell out with the greatest particularity the intention of the parties to extinguish negligence liability" in order to bar a claim. *Id.* at 1208 (quotation omitted). Releases from negligence are "strictly construe[d] against the party seeking immunity from liability." *Lloyd*, 2003 ME 117, ¶ 8, 833 A.2d 1.

---

[1] "Gross negligence or willful or wanton misconduct generally renders exculpatory provisions void." *Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp.*, 2005 ME 29, ¶ 15, 868 A.2d 220.

Here, the language of the release does expressly release OCF from liability for its own negligence. Ms. Charest argues that the language of that release must be interpreted as limited to the foreseeability of the specific danger she encountered. Ms. Charest bases this argument on a theory that the release functions as an agreement to assume the risk of using OCF's facilities. "Contractual assumption of risk ordinarily applies as a defense in an action between parties to the contract, most notably in the employer/employee context." *Foster v. Atwood*, No. CV-93-38, 1995 Me. Super. LEXIS 192, at *5 (May 25, 1995). Assumption of risk is an affirmative defense that may be raised by the defendant whereby "the defendant is held to owe the plaintiff no duty because plaintiff has assumed the risk of his voluntary activities." *Merrill v. Sugarloaf Mt. Corp.*, 2000 ME 16, ¶ 9, 745 A.2d 378. OCF has not raised a contractual assumption of the risk defense here.[2]

The Court was unable to find a single example of the Law Court limiting the scope of a release based on the law of assumption of risk. The Law Court in *Lloyd* looked to the language of the release to determine its scope, not external sources of law. *See Lloyd*, 2003 ME 117, ¶ 9, 833 A.2d 1 (release of liability expressly covered negligence arising directly or indirectly from any bicycle sporting event). OCF points to a case from New Hampshire, *Ladue v. Pla-Fit Health, LLC*, 173 N.H. 630, 247 A.2d 367 (N.H. 2020), where the New Hampshire Supreme Court found a release of liability covered injuries sustained by a plaintiff after tripping and falling on her way to a trashcan to throw away a towel she had used to wipe down equipment. *Id.* at 633. The New Hampshire Supreme Court held that the release of liability was sufficiently broad as to include

---

[2] OCF's 5th affirmative defense states only that "Plaintiff's Amended Complaint may be barred by contract." OCF has not indicated anywhere that it intends to assert a contractual assumption of the risk defense, and argues here that the relevant contract provision is a release from liability. OCF has not asserted an assumption of risk defense.

5

the plaintiff's injuries, even though they were not sustained during the use of exercise equipment. *Id.* at 640.

> The release in *Ladue* stated, in the relevant part:
>
> I understand and voluntarily accept full responsibility ... for the risk of injury or loss arising out of or related to my use ... of the facilities, and I further agree that Planet Fitness ... will not be liable for any injury ... resulting from the negligent conduct or omission of Planet Fitness, PF Corporate, or anyone acting on their behalf, whether related to exercise or not.

*Id.* at 632-33 (quotations omitted). The clause OCF's Membership Agreement has the following language:

> I understand and expressly agree that use of this orange circuit fitness facility . . . involves risk of injury to me and/or my guests whether caused by me or not. . . In consideration of my participation in the activities and use of the facilities offered by orange circuit fitness, I understand and voluntarily accept these risks and agree that orange circuit fitness . . . will not be liable for any injury . . . resulting from the negligence of orange circuit fitness or anyone on behalf of orange circuit fitness, whether related to exercise or not.

(Pl.'s Supp.'g S.M.F. ¶ 33.)

These two clauses are very similar. Both clauses specifically state that (1) the party signing the agreement understands and accepts the risks involved with using the exercise facilities, and (2) the party agrees that the gym will "not be liable for any injury . . . whether related to exercise or not." However, OCF's Membership Agreement's broad release language is more connected to the acknowledgement of risks than the agreement in *Ladue*. The release in *Ladue* separates the broad release of liability from the acknowledgement of risks with the phrase "I further agree," where OCF's Membership Agreement connects the two parts of the paragraph with a simple "I agree." The use of the term "further" suggests that that the second half of the paragraph is meant to be a separate agreement in addition to what comes before. Also, *Ladue*'s release expressly states at the beginning that the party signing the agreement "voluntarily accepts

6

full responsibility" for the risk of injury inherent in exercise. The release in *Ladue* therefore reads as a two-part release containing (1) an explicit assumption of risks inherent in the use of gym facilities; and "further" (2) a broad release of liability of any claim arising from defendant's negligence.

OCF's release does not have the clear structure of a two-part agreement. OCF's Membership Agreement begins only with an acknowledgement of the risks of exercise, and does not separate the broad release of liability with the term "further" to indicate that the two parts are separate. The release can be read as one continuous agreement, where Ms. Charest agreed to waive all claims arising out of OCF's negligence while using the facilities, whether related to exercise or not. Alternatively, the court could read OCF's release as analogous to the one in *Ladue*. However, mindful that ambiguities are to be interpreted against the drafter, especially under these circumstances where releases are "strictly construe[d] against the party seeking immunity from liability" and the contract is a standard-form contract of adhesion, the court must give the release the former construction. *See Barrett*, 2005 ME 43, ¶ 18, 870 A.2d 146; *Lloyd*, 2003 ME 117, ¶ 8, 833 A.2d 1.

The court's inquiry does not end here, however. The question now becomes whether Ms. Charest was injured while using the facilities, or not. Ms. Charest argues that the Membership Agreement differentiates between "facilities" and "premises." The Membership Agreement does not define either term.

The Membership Agreement uses the terms "facilities" and "premises" in multiple locations throughout. (*See* Def.'s Add. S.M.F. ¶¶ 7-10.) Some illustrative examples include:

> [O]range circuit fitness is not liable to you or your guest for any personal property that is damaged, lost, or stolen while on or around the *premises* of orange circuit fitness including, but not limited to, vehicle or its contents or any property left in a locker. If you or your guest cause damage to the *facilities* owned or operated by

orange circuit fitness, you are liable to orange circuit fitness for its cost of repair or replacement. . . .

Your membership permits you to use orange circuit fitness' *premises, facilities, equipment and services* . . . .

The All access orange pass members must be at least 18 years old to use the tanning and/or massage *facilities*. . . .

Members and guests to include Family Add-On members and guests aged 13 to 15 must have parent/guardian supervision while on the *premises* of ANY orange circuit *facility*. . . .

You acknowledge that the equipment and services in the *facilities* are available subject to demand and are offered on a "first come first serve basis." Orange circuit fitness regularly closes on a temporary basis its *facilities* (or portions of its *facilities*) for maintenance, selected holidays, inclement weather . . .

(*Id.*) (emphasis added). OCF argues that the usage of "premises" and "facilities" makes the meaning of the terms clear and unambiguous as a matter of law. The court disagrees.

The Membership Agreement clearly uses the terms "premises" and "facilities" to mean different things. The Membership Agreement discusses OCF's liability for property lost on the "premises," specifically including property lost from vehicles and lockers. (*Id.*) This shows that the term "premises" unambiguously includes areas inside and outside the OCF building. The term "facilities" clearly includes portions of the interior of the building, such as tanning and massage facilities. (*Id.*) The threshold of the building itself, however, is a grey area that is not clarified by the use of the terms.

The Membership Agreement does not, contrary to OCF's argument, use the term "facility" or "facilities" interchangeably with "building." The term "facility" unambiguously includes portions of the interior of the building but is never unambiguously used to mean the entirety of the building, or the exterior door. To be sure, the contract could be given a coherent reading where the term "facilities" refers to the entire building in certain contexts, but this is far

from the unambiguous meaning of the term. The term "premises," on the other hand, clearly includes both portions of the interior and exterior of the building. Therefore, whether the exterior door to the building is part of the "facility" or "premises," or both, is ambiguous.

Once again, under these circumstances the court is compelled to strictly construe the terms of the contract against OCF wherever they are ambiguous. Therefore, the court must construe the Membership Agreement to include the exterior door to the building as part of the "premises," but not part of the "facility." Because the Membership Agreement only releases OCF from liability for injuries sustained while using the facilities, the exterior door is not covered by the release. Because the release does not cover Ms. Charest's claim, the court declines to reach the issue of the release's enforceability.

The order is

> Plaintiff Henrietta Charest's motion for partial summary judgment is GRANTED. Defendant OCF-Health Clubs's cross-motion for summary judgment is DENIED.

> The Clerk is directed to enter this order into the docket by reference pursuant to M.R.Civ.P. 79(a).

Date: _____, 2022

Harold Stewart, II
Justice, Superior Court

9