# United States Court of Appeals
## For the First Circuit

Nos. 06-2270, 06-2271

PETER P. PERRY and MICHAEL T. BORDICK,

Plaintiffs, Appellants/Cross-Appellees,

v.

JOHN H. WOLAVER and BARBARA J. WOLAVER,

Defendants, Appellees/Cross-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Boudin, Chief Judge,

Campbell, Senior Circuit Judge,

and Howard, Circuit Judge.

Kevin J. Beal, with whom Peter J. Brann and Brann & Isaacson, were on brief, for appellants/cross-appellees.
David C. Johnson, with whom George J. Marcus, Dale D. Wengler and Marcus, Clegg & Mistretta, P.A. were on brief, for appellee/cross-appellants.

October 26, 2007

**HOWARD**, **Circuit Judge**.  This case involves the sale of a business which went awry.  Plaintiff-sellers Peter P. Perry and Michael T. Bordick (we will refer to them hereafter collectively as "Perry") brought this action against defendant-buyers John and Barbara Wolaver ("the Wolavers") seeking to enforce various default provisions under the relevant agreements.  The district court granted summary judgment largely in favor of the Wolavers, and both sides appealed.

## I.

The basic facts are essentially undisputed.  Perry sought to sell two businesses, Perry Transport, LLC and Perry Transport Logistics Services, LLC ("the companies"), and the Wolavers agreed to purchase the companies.  The parties signed a letter of intent which outlined the essential terms of the transaction and acknowledged that Perry would retain the cash and certain personal vehicles (as well as certain liabilities) from the companies after sale.  The parties closed on the transaction on February 27, 2004, and they executed several agreements, which are the focus of this dispute.  The Purchase and Sale Agreement ("PSA") provided for a purchase price of $715,000, with $400,00 to be paid in cash at closing and the balance provided by a promissory note ("Note") for $315,000.  Further, the PSA provided for an adjustment of the actual sale price after closing to reflect changes in the net assets on the balance sheet between year-end and the date of

-2-

closing. This purchase price adjustment ("PPA"), which the parties were required to agree upon within 30 days of closing, would be determined as follows:

> (a) . . . The Purchase Price shall be adjusted (i) upward by the excess, if any, of the total value of the assets net of liabilities on the books of [the companies] as of the Closing Date (the "Net assets") exceeds Three Hundred Sixty-Six Thousand Nine Hundred Fifty-Six Dollars ($366,956) (the "Baseline Amount"), or (ii) downward by the excess, if any, of the Baseline Amount over the Net Assets . . . .

The Note required the Wolavers to pay Perry $6,163.36 on the first of every month until March 1, 2009, when the remaining balance was due. The Note provided for a range of consequences if the Wolavers failed to make payments as scheduled, including late fees[1] and increased interest.[2] The most significant sanction under the Note, however, was acceleration of principal:

> If any installment under this Note is not paid within fifteen (15) days of its due date or

---

[1] "If Borrowers fail to deliver to Holders any installment hereunder, including but not limited to the Balloon Payment, within fifteen (15) days of its due date, a five percent (5.00%) late fee shall be assessed and added to the outstanding amounts due under this Note."

[2] "The principal balance of this Note outstanding from time to time shall bear interest at a fixed rate equal to **six and one-half percent (6.5%) per annum. A default interest rate ("Default Rate") of twelve percent (12%) per annum shall accrue from the date of default by Borrowers in the obligations under this Promissory Note**." (Emphasis in original.)

Borrowers fail to perform any of the terms, agreements, covenants or conditions contained in the **Pledge Agreement** and/or **Commercial Lease Agreement** between these same parties, and/or a certain **Promissory Note from [the Wolavers]** to Holders in the amount of $107,748.43, all of near or even date herewith, or other instruments given as security for this Note, not cured within any applicable cure period, a Default shall be deemed to have occurred under this Note, and then, or at any time thereafter during the continuance of any such Default, the entire unpaid balance of the Note together with any interest accrued thereunder, shall, at the election of the Holders, and without Notice of such election and without Demand or Presentment, become immediately due and payable, and the principal balance together with any interest accrued thereunder shall thereafter bear the simple interest at the Default Rate until paid. The failure of the Holders to promptly exercise their rights to declare the indebtedness remaining unpaid hereunder to be immediately due and payable or the acceptance of one or more installments from any person shall not constitute a waiver of any of Holders' rights while any Default continues nor a waiver of Holders' rights in connection with any subsequent Default. The Holders may exercise this option to accelerate during any Default by the undersigned regardless of any prior forbearance. . . . (Emphasis in original).

Under "Additional Terms," Perry also reserved broad rights to modify the Note's terms, including reducing the payments, extending the term, or otherwise modifying the Note's provisions. The Note in turn was secured by the Pledge and Security Agreement ("Pledge").

The Pledge gave Perry a security interest in 100% of the membership units of the companies. The Pledge also contained what the parties have characterized as a "cure provision," which required Perry to provide "fifteen (15) days prior written notice to" the Wolavers after a default before utilizing any remedy under the Pledge. The most significant default under the Pledge was "failure to pay any of the obligation secured hereby [the Note] when due not cured within any applicable cure period . . . ." The most significant remedy under the Pledge was the transfer of ownership of the membership units back to Perry.

In late March, Perry's broker calculated the PPA, but he disregarded the formula provided for in the PSA. The broker instead recalculated the assets (not including cash and cash equivalents) and liabilities as of year-end and closing, determined the change in each, and concluded that there was an increase in net assets of $41,151. The broker's error was not noticed at the time, and the parties accepted this figure and entered into an oral agreement for the Wolavers to pay off the PPA in monthly installments to Perry.[3]

For approximately a year, all went smoothly. However, in early 2005, the Wolavers discovered the error in the calculation of the PPA and concluded that a proper calculation would have resulted

---

[3] To date, the Wolavers have paid $26,852.82 under the oral agreement.

in a substantial reduction in purchase price. The parties began negotiating the matter.

During the negotiations, the Wolavers paid both the April and May 2005 payments after the 15-day grace period each month, and neither payment included late fees or the increased default-rate interest. Perry accepted these payments without comment. However, when the June payment did not arrive on time, Perry sent a notice letter, dated June 27, 2005, stating that the Wolavers were in default under the Note: "because [the Wolavers] failed to make [their] June 1, 2005 [payment] on a timely basis." The notice letter also advised that:

> Interest on that note is now increased to twelve percent (12%) per annum, the default interest provided in the note. Additionally, you now owe late fees for that note for the months of March, April, May and June as the note provides.

Lastly, the notice letter cautioned that:

> your default of your obligations on the promissory note also constitute [sic] a default of the Pledge and Security Agreement dated February 27, 2004, securing the promissory note. This letter shall serve as your **fifteen (15) day notice to cure** under that Agreement. Your failure to cure within the cure period will trigger all of my clients' rights to the membership interests in both limited liability companies.

(emphasis in original).

Further negotiation yielded a ten-day extension to the cure period, and the Wolavers tendered the June and July checks

-6-

within the extended cure period. But Perry did not cash them because they failed to include late fees and default-rate interest. Instead, Perry sent a default letter dated July 26, 2005, notifying the Wolavers that the extended cure period had expired and that Perry was accelerating the note and demanding immediate payment.

Shortly thereafter, Perry brought this action in district court claiming breaches of the Note, oral agreement, and Pledge and seeking reformation of the PSA. The Wolavers counterclaimed, seeking a declaratory judgment that the PPA was overstated and that they were not in breach or default of the Note. They also sought recision of the oral agreement and reformation of the Note. Both sides moved for partial summary judgment.

The district court first held that Perry had waived interest and late fees for the April and May payments. The court further concluded that the Note and Pledge ought to be read together and that the "cure" period in the Pledge was incorporated into the Note. The court then held that the Wolavers had cured the defaults under the Note by tendering their June and July payments within the extended cure period, cutting off Perry's right to accelerate the Note or claim remedies under the Pledge. As to default-rate interest and late fees for the June and July payments, the court stated that these penalties were intended to be added to the principal and not paid with the late installments.

In addition, the district court recalculated the PPA, using the formula provided in the PSA. Significantly, the district court excluded the cash and other assets to be distributed to Perry held by the companies at closing in determining net assets at the time of sale.[4] The district court concluded that the Wolavers were entitled to a revised PPA of $48,276 in their favor (plus the return of their prior payments on the oral agreement). The district court denied summary judgment as to the remaining claims and denied the Wolavers' motion for attorney's fees. The parties then settled the remaining claims so the district court could enter final judgment, and this appeal followed.

## II.

Perry argues that the district court erred in holding that the Wolavers were not in default of the Note and that the court grossly miscalculated the PPA. On cross-appeal, the Wolavers contend that the district court erred in denying their motion for attorney's fees. We reject each of the claims.

"We review a district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmovant." Hodgkins v. New England Telephone Co., 82 F.3d 1226, 1229 (1st Cir. 1996). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions

---

[4] In effect, the district court utilized the companies' balance sheet as it appeared a few days post-closing after the distribution to Perry.

-8-

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). "We may affirm a summary judgment decision on any basis apparent in the record." Uncle Henry's Inc. v. Plaut Consulting Co., 399 F.3d 33, 41 (1st Cir. 2005).

Under Maine law, the interpretation of a contract's unambiguous terms is a question of law for the court, and we review this determination de novo. Crowe v. Bolduc, 365 F.3d 86, 95 (1st Cir. 2004). Contracts should be interpreted to give effect to the parties' intentions expressed by the writing, considering the subject matter, purpose, and object of the contract. Id. at 95. Further, a contract should "be interpreted so as to give force to all its provisions." Id. at 97. Moreover, if the parties enter into multiple contracts at the same time to complete a single transaction, "the contracts ought to be construed together." Id. at 95.

## A. Breach of the Note

Perry asserts four grounds for his argument that the Wolavers were in default of the Note, entitling him to accelerate payment of the principal. First, he argues that the Note "automatically" accelerated with the first late payment in April. Second, Perry asserts that there was no waiver of late fees or default-rate interest for the April and May payments; moreover, in

light of the "no waiver" clause, Perry could accelerate the Note based on these continuing defaults. Third, he maintains that there is no right to cure under the Note, and the Note did not incorporate the "cure" provision in the Pledge. Fourth, even if there was a right to "cure" under the Note, the Wolavers failed to do so because their June and July payments failed to include default-rate interest. Perry also says that as a consequence of that default, the Wolavers were also in default on the Pledge, triggering the remedies therein. We examine these contentions in turn and find all of them lacking.

Perry's assertion that the late April payment automatically (and with no "notice" required[5]) accelerated the principal is a nonstarter. This position is expressly contradicted by the Note, which makes accelerating the principal merely an option Perry could affirmatively elect in the event of a default. Moreover, Perry's own conduct makes it obvious that Perry did not accelerate the Note or believe that the Note had been automatically

---

[5]   Perry emphasizes that no "notice," "demand" or "presentment" is required to invoke the Note's default provisions. Indeed, Perry insists that all communications with the Wolavers about the default under the Note were essentially gratuitous. Perry's rigidly literalist position confuses legal "notice" and practical business communication. For example, given that Perry had the option of accelerating the Note in the event of a default, how would a defaulting debtor know the option was being exercised (and payment due) in the absence of a communication from Perry? Further, how would a hypothetical debtor know that a mailed payment arrived after the fifteenth of the month, thereby potentially invoking the default interest rate, if Perry did not so inform the debtors?

accelerated in April. Notably, Perry's notice letter only sought default-rate interest and late fees as a sanction for the late payments. There was no hint that Perry anticipated anything other than the continuation of installment payments.

Perry's claim that default-rate interest was not waived for the April and May payments is also refuted by the record. Perry's notice letter specifically provided that default-rate interest was triggered by the late June payment, not before. Significantly, the notice letter explicitly sought late fees as the only sanction for the tardy April and May payments.[6] In addition, Perry's reliance on the "non-waiver" provision is misdirected. Under the Note, a forbearance by Perry regarding a default does not waive Perry's right to any remedy under the Note during any continuing or subsequent default. That, however, is beside the point. The real issue is whether Perry could choose to excuse a specific default and waive the penalty for that specific default. On that score, Perry had that power – under both the default clause and the broadly worded additional powers clause - and exercised it for the late April and May payments.

Perry next claims that there is no right to cure in the Note and no such right could be imported from the Pledge. This

---

[6]     On appeal, Perry appears to have conceded that late fees would need not be included with a late payment, but instead would be added to principal.

-11-

contention also does not bear scrutiny. As noted by the district court, the relevant documents were collectively directed to accomplishing the sale of the companies, and thus properly construed together under Maine law. See Crowe, 365 F.3d at 95. The conclusion that the documents were intended to be interrelated is buttressed by the fact that both the Note and Pledge expressly refer to each other, and events under one trigger consequences under the other.[7]

Further, a full and fair reading of the Note's language indicates that there is a right to cure defaults under the Note. For example, the Note's default clause includes the qualification, "not cured within any applicable cure period," strongly suggesting that defaults need not be fatal. The default clause also includes such phrases as "while any Default continues" and "during any Default" language which anticipates that defaults can be remedied. Moreover, the Pledge expressly provides that a default would include "failure to pay any of the obligation [Note] secured hereby when due not cured within any applicable cure period . . . ." While it is conceivable that this is a conditional catchall provision, we will not rush to such an interpretation, which would

---

[7]    For example, the Note provides: "The indebtedness evidenced by this Note is secured by a Pledge Agreement of the Borrowers' membership interest in [companies], as well as guarantees by those limited liability companies, and reference is made thereto for additional rights as to the acceleration of the indebtedness evidenced by this Note." (Emphasis added.)

render the language surplusage if defaults under the Note are incurable. See Crowe, 365 F.3d at 97 (contracts must be interpreted to avoid rendering terms meaningless, nonsensical, or mere surplusage). In addition to the linguistic problems with Perry's position, there is a logical one as well. The only default that triggered the Pledge was the default on the Note, and the only way to cure the default under the Pledge was to cure the default under the Note. But, if defaults under the Note are incurable, we are at a loss to understand to what cure the June 27, 2005, notice letter refers. Accordingly, we reject Perry's argument on this issue as well.

Lastly, Perry claims that, even if the Wolavers had the opportunity to cure, they failed to do so because the tendered June and July payments did not include interest at the default rate, which was "automatically" triggered by the late April payment. We have already rejected this thesis about the April payment. In addition, the district court noted that there was no default because, like late fees, the default-rate interest was to be added to the principal balance, not the individual monthly payments. Moreover, pursuant to Perry's own decree in the notice letter, the default-rate was not activated until June 27, 2005 (the date of the notice letter). But the notice letter simultaneously triggered the cure period, which, as noted above, permits any defaults under the Note to be remedied. All these approaches lead to the same

-13-

conclusion: the Wolavers cured the defaults by tendering the June and July payments within the extended cure period, and therefore Perry had no basis for invoking the acceleration clause.

The parties concede that the agreements are not models of clarity.  At the end of the day, we are left with the district court's reading of the agreements, which is plausible, and Perry's interpretation, which is not.  Because "there is no room for any <u>reasonable</u> difference of opinion as to the meaning" of the agreements, <u>Crowe</u>, 365 F.3d at 97 (emphasis in original), the district court's holding stands.  <u>See</u>, <u>e.g.</u>, <u>Global Naps, Inc.</u> v. <u>Verizon New England, Inc., et al.</u>, 2007 WL 2994613, at *5 (1st Cir. Oct. 16, 2007) (affirming interpretation where, faced with cloudy contract language and a contingency that the parties may not have fully thought through, the decision could be squared with the language of the contract and no linguistic solution offered by the appellants was more obviously correct).

## B.  Calculation of PPA

Perry also argues that the district court erred by calculating the PPA using a comparison date other than the closing date in contravention of both the PSA and the parties' expectations.  Perry also asserts that the excluded cash and other assets were assets of the companies on the closing date, and therefore should be included in the net asset amount for purposes of calculating the PPA.  We reject this challenge.

The district court's asserted shift of the "closing date" to February 29, 2004,[8] for purposes of the calculation is not important. The real question is whether the calculation of the PPA should include the cash and other assets[9] to be retained by Perry after the sale as assets of the companies for purposes of determining the net assets "at closing." The district court excluded these assets from the calculation. Whether this exclusion is characterized as doing the calculation at the date of ultimate distribution of the assets to Perry (instead of the actual closing date) or simply excluding these assets from the closing day assets because they were not assets of the companies (as they belonged to Perry) or whether these assets were deemed offset on the balance sheet by a liability to Perry is of no real consequence. The only issue is whether the decision to exclude the assets was proper.

In the end, there is no dispute that the assets were intended to be distributed to Perry shortly after closing and would thus not inure to the benefit of the Wolavers. Further, because the PSA provided that the Wolavers were purchasing the assets belonging to the companies, and the disputed assets belonged to Perry, the district court was correct to exclude these assets from

---

[8] The only difference of any consequence in the financial statements on the competing dates is the presence or absence of the cash assets distributed to Perry.

[9] The record indicates that personal vehicles and the like would also leave with Perry.

the PPA calculation. It would make no commercial sense for the Wolavers to "purchase" cash that they would never receive – particularly when they had arranged for a separate loan from Perry to provide working capital for the companies to replace the cash that was distributed. Moreover, Perry's position, if accepted, could lead to illogical results. For example, if all assets even technically possessed by the companies on the closing date were included in the calculation, the Wolavers would be charged for the value of Perry's personal vehicles parked on the premises at closing, even though Perry would be driving them away immediately thereafter. Similarly, Perry's argument that an "apples to apples" comparison would require excluding the cash from the December 31, 2003 balance sheet for the PPA calculation is also unpersuasive. As the district court noted, there is no indication that this was the parties' intent, and the PPA is specifically designed to account for such changes in the balance sheet between year-end and closing. We discern no error in the district court's calculation.[10]

_____

[10] Lastly, Perry also claims that the district court committed reversible error by permitting the Wolavers to file their response to Perry's motion for summary judgment approximately 7 days late. Counsel for the Wolavers stated that he had failed to receive a timely electronic notice of the motion, but conceded that he had received all other such notices in the case. Perry's essential thesis is that the Wolavers' reason for being late smacked of simple inattentiveness by counsel, which does not constitute "excusable neglect" to excuse a late filing.

"Under the excusable neglect rubric, courts are permitted, when appropriate, to accept late filings caused by inadvertence or mistake." Bennet v. City of Holyoke, 362 F.3d 1, 5 (1st Cir. 2004). Whether a given error is excusable "has a significant

-16-

C. Attorney's Fees

In their cross-appeal, the Wolavers argue that the district court erred in denying their motion for attorney's fees under the indemnity provision of the PSA.[11] They argue that the duty to properly calculate the PPA was an "obligation" Perry assumed prior to closing and failed to meet. Alternatively, they posit that miscellaneous errors in the financial statements

---

equitable component and must give due regard to the totality of the relevant circumstances." Bennet, 362 F.3d at 5. Moreover, we generally defer to the district court's broad discretion in assessing such case management decisions. See Perez-Cordero v. Walmart Puerto Rico, 440 F.3d 531, 533-34 (1st Cir. 2006).

The district court, while somewhat dubious of the adequacy of counsel's excuse, nonetheless concluded that the filing would be allowed. The court was persuaded by the following factors: (1) the Wolavers had not missed any previous deadlines; (2) the Wolavers had responded promptly upon learning of their error; (3) there was no hint of bad faith or intent to delay, and (4) there was no prejudice to Perry because the same issues and evidence were already before the court. In light of the district court's thorough consideration of all the circumstances, we see no abuse of discretion.

[11] "Sellers shall indemnify Buyers and hold Buyers harmless from and against any and all claims, losses, liabilities or expenses, including reasonable attorneys' fees, which may be asserted against or incurred by Buyers or [companies] as a result of obligations incurred by Sellers or [companies] on or prior to Closing, or arising from any act or omission of Sellers or [companies] and their agents, servants, and employees on or prior to Closing except for those liabilities disclosed in [companies'] balance sheets delivered to Buyers at Closing. Sellers shall also indemnify Buyers and hold Buyers harmless from and against all claims brought under workers' compensation or other laws where the facts giving rise to such claim occurred on or prior to the Closing Date. . . ."

provided by Perry, which Perry warranted were accurate, also justify attorney's fees. These contentions each have fatal flaws.[12]

First, the calculation of the PPA (and the subsequent agreement regarding its payment) did not occur prior to or at closing. The Wolavers attempt to blunt this fundamental truth by maintaining that the closing did not "really" take place until the PPA was calculated. However, the calculation of the PPA was defined in the PSA as, and understood by all parties to be, a post-closing event. Moreover, calculating the PPA was a mutual obligation of the parties, and, as calculated by the district court, the PPA was a benefit (not an undisclosed liability) to the Wolavers.

Second, as to the alleged inaccuracies in the financial statements as a basis for attorney's fees, the Wolavers also face an insuperable problem. These claims were settled. The Wolavers riposte that the right to seek attorney's fees based upon these claims was preserved in the settlement, with the provision:

> This stipulation shall not be construed as a waiver of (a) the Defendants' ability to assert claims for certain balance sheet adjustments and for attorney's fees against the Plaintiffs pursuant to the terms of the February 27, 2004 Purchase & Sale Agreement, (b) the Plaintiffs' ability to defend against said claims, or (c) of any party's ability to

---

[12]    Perry now argues that the Wolavers' request for fees came too late in the district court, but Perry waived this procedural argument by failing to raise it below.

> advance any argument on appeal permitted by applicable law or court rule.

This language, however, is more naturally read as being directed to the primary dispute – what assets were to be included on the balance sheet for purposes of calculating PPA – because no other balance sheet claims were "asserted" or "defended."  Moreover, there is a more fundamental problem with the Wolavers' position.  Because these financial statement claims were resolved by settlement, the district court would have no basis for assessing the presence and significance of any alleged errors and therefore would be unable to determine the propriety and amount of any potential award of fees.

For the reasons stated above, the judgment of the district court is **affirmed**.  Each side shall bear their own costs.