STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-13-314,
JAW-CUM 11/15/2013

JEROME B. GOLDSMITH and TAMI B.
GOLDSMITH,
    Plaintiffs

v.

MERRILL LYNCH, PIERCE, FENNER,
AND SMITH, INC. and
ALEKSANDAR ACIMOVIC
    Defendants

ORDER ON MOTION TO
COMPEL ARBITRATION



STATE OF MAINE

NOV 15 2013

RECEIVED

Before the Court is the defendants' motion to compel arbitration and to dismiss or stay plaintiff's suit.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2007, the Goldsmiths opened an "Unlimited Advantage" account with Defendant Merrill Lynch. (Compl. ¶ 11, 15.) Defendant Aleksandar Acimovic became the Goldsmiths' broker on the account. (Compl. ¶ 12.) The Goldsmiths claim they invested their money with Merrill Lynch to get the benefit of the company's investment advisory services. (Compl. ¶ 19.) The Goldsmiths allege that they were led to believe their Merrill Lynch account was an investment advisory account, but the Goldsmiths had actually signed up for a brokerage account. (Compl. ¶¶ 15-16.)

On July 27, 2007, Mr. Acimovic invested $500,000 of the Goldsmiths' savings into a single IPO, the Cohen & Steers Global Income Builder Fund ("INB Fund"). (Compl. ¶ 23.) The Goldsmiths allege that Mr. Acimovic made various positive representations about the fund, including that the Goldsmiths could expect a 10% yield. (Compl. ¶ 27.) The fund started trading at $20 a share, but in 2008, the price collapsed to

$6 a share. (Compl. ¶¶ 34-35.) Since 2008, the INB Fund has traded at between $9 and $11 per share. (Compl. ¶ 36.) The Goldsmiths have since learned that Merrill Lynch was the principal underwriter for the INB Fund IPO and needed to sell 13,810,000 shares to investors. (Compl. ¶ 28.) The Goldsmiths allege that Merrill Lynch stood to make significant fees as underwriter for the IPO and offered its brokers incentives and commissions to sell the INB Fund to client-investors. (Compl. ¶ 29.)

On July 19, 2013, the Goldsmiths filed a five-count complaint including: count I: negligence; count II: negligent supervision; count III: negligent misrepresentation; count IV: intentional misrepresentation; and count V: breach of fiduciary duty. On August 20, 2013, Defendants filed a motion to compel arbitration pursuant to 9 U.S.C. § 3 (2012). The signed agreement does contain an arbitration provision. Plaintiffs rely on *Barrett v. McDonald Investments, Inc.* 2005 ME 43, 870 A.2d 146, a Law Court case with similar facts in which the court construed an ambiguous arbitration provision against the drafter and held it inapplicable to investment advice not covered under the agreement.

## DISCUSSION

The Court must decide whether the parties intended to submit the current dispute to arbitration under their agreement. *V.I.P., Inc. v. First Tree Dev., LLC*, 2001 ME 73, ¶ 3, 770 A.2d 95. In *Barrett*, the Law Court grappled with two competing rules of construction: the strong presumption in favor of arbitration and the principle that ambiguities in a contract must be construed against the drafter. *Barrett*, 2005 ME 43, ¶ 15, 870 A.2d 146. The *Barrett* Court held, "when a party drafts an agreement requiring arbitration, and offers it to individuals on a take-it-or-leave-it basis, the drafter bears the risk if its chosen language is found to be ambiguous." *Id.* ¶ 22. The Court must therefore

2

decide whether the arbitration agreement is ambiguous as to whether the current dispute must be arbitrated.

### 1. Governing Law

When an arbitration clause is part of a contract that involves interstate commerce, "the FAA governs." *Stenzel v. Dell, Inc.,* 2005 ME 37, ¶ 7, 870 A.2d 133. However, "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995).

Defendants argue that New York law applies to the Court's interpretation of the contract. Defendants rely on *Stenzel v. Dell, Inc.,* but in that case, the Law Court merely "assume[d], without deciding, that the agreement's choice of law provision controls and that Texas law governs the determination of all of the issues presented by the appeal." *Stenzel,* 2005 ME 37, ¶ 8, 870 A.2d 133. The court explained, without citing to Texas law, that "if the agreement is ambiguous, the reservation clause must be construed against Dell . . . ." *Id.* ¶ 22. The agreement in *Barrett* specified that Ohio law applied to the arbitration agreement. *Barrett,* 2005 ME 43, ¶ 3, 870 A.2d 146. Nevertheless, the court decided "whether to construe an ambiguity in an arbitration clause in favor of arbitration or against the drafter pursuant to Maine law." *Id.* ¶ 22 n.4.

Even if the Court were to apply New York law, the same principles of contract interpretation would apply to this case. Defendants rely on *PaineWebber, Inc. v. Bybyk,* 81 F.3d 1193 (2d. Cir. 1996), to establish that the Goldsmiths' claims are within the scope of the arbitration provision. That case also involved clients and a broker, but the defendant broker there wanted the court, as opposed to the arbitrator, to decide whether

3

the client had a valid claim. *PaineWebber*, 81 F.3d at 1197. The Second Circuit Court of Appeals specifically found that "the common-law rule of contract interpretation that 'a court should construe ambiguous language against the interest of the party that drafted it' applies in interpreting arbitration agreements." *Id.* at 1199. Furthermore, the clients alleged that PaineWebber failed to supervise the account and breached a fiduciary duty—claims that were directly governed by the investment agreement and not distinct tort claims as the Goldsmiths allege here. *Id.* at 1195.

Finally, Defendants only raised their argument that New York law should apply in their reply brief. In their initial brief supporting their motion to compel arbitration, Defendants cite to Maine law, including *Barrett*, and fail to mention the agreement's choice of law provision. Under Rule 7(e), "the moving party may file a reply memorandum, which shall be strictly confined to replying to new matter raised in the opposing memorandum." M.R. Civ. P. 7(e). Neither the Defendants in their initial brief nor the Plaintiffs in their opposition mentioned the governing law provision, and therefore, the Court finds that Defendants cannot raise this issue in their reply brief. *See Moriarty Water Works, Inc. v. Portland Water Dist.*, 2003 WL 23109990 (Me. Super. Nov. 3, 2003).

2. Interpretation of Arbitration Clause

a. Scope of the Arbitration Provision

Defendants attempt to distinguish *Barrett* on the grounds that the agreement the Goldsmiths signed contains a much broader arbitration provision than the one at issue in *Barrett*. In *Barrett*, the Law Court described the agreement at issue as follows:

> The Agreement provided that Laurence would deposit funds with McDonald, which McDonald would invest in options selected by Laurence upon Laurence's

4

instructions and direction. The Agreement disclaimed any fiduciary relationship and did not in any way describe McDonald or Sullivan as having any advisory roles.

Id. ¶ 3. The *Barrett* arbitration provision used broad language:

> The Custodian [McDonald] and the Depositor [Laurence Barrett] agree that by the Custodian opening and carrying an account for the Depositor, all controversies which may arise between us concerning any transaction or the construction, performance or breach of this or any other agreement between us pertaining to securities and any other property, whether entered into prior, on or subsequent to the date thereof, shall be determined by arbitration.

*Id.* The Law Court found that despite this broad language, the agreement at issue described McDonald as performing purely custodial duties, and it was therefore ambiguous "whether the giving of investment advice constitutes a 'transaction' within the meaning of the arbitration clause." *Id.* ¶ 19.

> The agreement that the Goldsmiths signed on June 1, 2007 is similarly broad:

> You agree that all controversies that may arise between us shall be determined by arbitration. Such controversies include, but are not limited to, those involving any transaction in any of your accounts with Merrill Lynch, or the construction, performance or breach of any agreement between us, whether entered into or occurring prior, on or subsequent to the date hereof.

(First Brady Aff. ¶ 4; Exhibit A, p. 2.) Defendants rely on the "not limited to" language to distinguish the arbitration provision from the one in *Barrett*. The examples that follow, however, concern controversies arising out of the agreement. A reasonable interpretation is that "all controversies" includes everything within the scope of the agreement. *See Penobscot Nation v. Stilphen*, 461 A.2d 478, 489 (Me. 1983) ("[A] general term followed by a list of illustrations is ordinarily assumed to embrace only concepts similar to those illustrations."). If, as in *Barrett*, "it is unclear whether the giving of investment advice constitutes a 'transaction' within the meaning of the arbitration clause," the "not limited to" language does not save the arbitration clause here. *Barrett*, 2005 ME 43, ¶ 3, 870

5

A.2d 146. To hold otherwise would require an interpretation that renders the examples surplusage. *See Perry v. Wolaver*, 506 F.3d 48, 55 (1st Cir. 2007) ("While it is conceivable that this is a conditional catchall provision, we will not rush to such an interpretation, which would render the language surplusage . . . ."). Accordingly, unless the agreement the Goldsmiths entered into includes advisory services, the Court must apply the holding in *Barrett*.

### b. Brokerage Account

The agreement, dated June 1, 2007, describes the Unlimited Advantage account the Goldsmiths opened as follows:

> If you are enrolling an account in the Unlimited Advantage service, please note that the account is a brokerage account and not an advisory account. Merrill Lynch's interests may not always be the same as yours. Please ask us questions to make sure you understand your rights and our obligations to you, including the extent of our obligation to disclose conflicts of interest and to act in your best interest.

(First Brady Aff. ¶ 4; Exhibit A, p. 1.) This is the first agreement that the Goldsmiths signed. The agreement is called the Merrill Lynch Client Relationship Agreement ("Client Relationship Agreement"). The Client Relationship Agreement, by its express terms, is limited to brokerage services and does not include investment advice. Similar to the institution in *Barrett*, Merrill Lynch is disclaiming any advisory role for this account. In an attempt to escape this conclusion, Defendants offer two arguments.

First, the Goldsmiths signed up for an advisory account on November 29, 2007, six months after they signed up for the Unlimited Advantage account. (Second Brady Aff. ¶ 2; Exhibit A.) The agreement the Goldsmiths signed on November 29, 3007 is called the Client Agreement. The Goldsmiths signed this agreement after Mr. Acimovic invested the bulk of the Goldsmiths' money in the INB Fund. (Compl. ¶ 23.) The

6

language in the arbitration clause contained in the Client Agreement is almost identical to that in the first:

> You and we agree that all controversies that may arise between us shall be determined by arbitration. Such controversies include, but are not limited to, those involving any transaction or the construction, performance or breach of this or any other agreement between us, whether entered into or occurring prior, on or subsequent to the date hereof.

(Second Brady Aff. ¶ 2; Exhibit A, p. 24.). Defendants claim that because the Client Agreement clearly includes investment advice, the Goldsmiths agreed to arbitrate any disputes concerning investment advice, even if that advice was offered and acted upon prior to the Client Agreement. This arbitration clause, however, could reasonably be interpreted to apply to conduct arising out of the agreements between the parties. The Goldsmiths' claims do not arise out of any conduct contemplated by any of the agreements because they concern investment advice given prior to the date the Goldsmiths opened their advisory account.

Second, Defendants argue that the description of the Unlimited Advantage account in the Unlimited Advantage Disclosures and Agreement ("Unlimited Advantage Agreement") demonstrates that investment advice was part of the original agreement. Defendants rely on part of the Unlimited Advantage Agreement that states:

> Unlimited Advantage is a non-discretionary brokerage service from Merrill Lynch that allows you to consult with a Financial Advisor, buy and sell securities and make other financial decisions all for an annual asset-based fee . . . just like commission-based brokerage accounts, any investment advice we provide in connection with your investment activity is part of, and incidental to, the brokerage services we provide to you.

(Second Brady Aff. ¶ 6; Exhibit B, p. 1.) There are two problems with this argument.

First, this description was not in the original client agreement that the Goldsmiths signed on June 1, 2007. This description is contained in the Unlimited Advantage

7

Disclosures and Agreement (Unlimited Advantage Agreement) describing the Unlimited Advantage program that the Goldsmiths agreed to on July 1, 2007. This document does not contain an arbitration provision. Defendants argue that the Unlimited Advantage program description must be read in conjunction with the initial client agreement the Goldsmiths signed. Only by reading the two documents together can the Defendants show both an arbitration provision and a description of investment services. That it takes two distinct documents to illuminate the scope of the arbitration clause goes a long way to showing that it is ambiguous.

Second, directly under the paragraph that mentions investment advice, the Unlimited Advantage Agreement states that "[a]n account enrolled in the Unlimited Advantage services is a brokerage account and not an advisory account." (Second Brady Aff. ¶ 6; Exhibit B, p. 1.) Furthermore, the document reads:

> Unlimited Advantage is a full-service brokerage pricing alternative, not an investment advisory service, and neither we nor any employee intends to act or is acting as an investment advisor or investment manager.

(Second Brady Aff. ¶ 6; Exhibit B, p. 16.) Thus, it is reasonable to conclude that advisory services are outside the scope of the agreement with the Goldsmiths.

Merrill Lynch is trying to have it both ways: it provides a brokerage account that does not include investment advisory services, but it wants its arbitration provision to apply to any investment advice its employees might render to clients. In walking this fine line, Merrill Lynch has drafted an ambiguous arbitration provision. It would be reasonable for the Goldsmiths to believe that the arbitration provision in an agreement limited to brokerage services does not apply to investment advice. Accordingly, the Court finds that the arbitration clause is ambiguous as to whether the Goldsmiths must arbitrate

8

their tort claims. Under *Barrett*, this ambiguity must be construed against Merrill Lynch, and the Goldsmiths are therefore not required to arbitrate their tort claims.

### 3. Unconscionability

The Goldsmiths argue in the alternative that the arbitration clause is unconscionable. Because the Court finds in the Goldsmiths' favor under their ambiguity argument, the Court need not address whether the arbitration clause is unconscionable.

The entry is:

Defendants' motion to compel arbitration is DENIED.

Date:   November 15, 2013

Joyce A. Wheeler
Justice, Superior Court

Plaintiffs-Eben Albert Knopp Esq
Defendants-Mark Porada Esq

9